(38 South. 539.)

No. 15,314.

BERLIN v. P. L. CUSACHS, Limited.*

(March 27, 1905.)

CORPORATIONS—AUTHORITY OF PRESIDENT—DISCHARGE OF EMPLOYÉ—DAMAGES.

1. The authority of the subordinate agents of a corporation often depends upon the course of dealing which the company or its directors have sanctioned. It may be established sometimes without reference to the official record of the proceedings of the board, by proof of the usages which the company has permitted to grow up in the business, and of the acquiescence of the board charged with the duty of supervising and controlling the company's business. Parties dealing with the president of a corporation in the usual manner, and within the scope of the powers which the president has been accustomed to exercise without the assent of the directors, and not ultra vires of the corporation, would be entitled to assume that he had been actually invested with those powers.

2. In order to warrant the discharge of the manager of a corporation, whose services had been employed for a fixed time and at a fixed price, before the expiration of the time agreed upon, there should exist grounds of complaint against him of a serious character; and, should a discharge be made without the existence of such serious grounds, the corporation will ren-

*Rehearing denied April 24, 1905.

der itself liable to the discharged employé, as provided for in article 2749 of the Civil Code.

3. It will not, however, be liable to him for remote, collateral damages arising from unjust or unauthorized inferences or conclusions adverse to him which the public may draw against him from the mere fact itself of the discharge. The corporation might be liable in damages if the discharge was accompanied by special features giving rise to an independent cause of action.

(Syllabus by the Court.)

Appeal from Civil District Court, Parish of Orleans; Fred D. King, Judge.

Action by Henry Berlin against P. L. Cusachs, Limited. Judgment for plaintiff. Defendant appeals. Modified.

Hughes & Favrot, for appellant. E. A. O'Sullivan, for appellee.

### Statement of the Case.

NICHOLLS, J. The plaintiff prays for a judgment against the defendant for $1,453.80 and interest for salary alleged to be due him, and the additional sum of $5,000 and interest as damages to his character, reputation, ability, integrity, industry, and capacity by reason of having been summarily discharged from his employment by the defendant without cause, and solely from personal malice and the desire to do him harm.

His petition contains the allegations usual in actions of that kind.

Defendant answered, pleading the general issue.

It denied that it (or any person authorized by it) entered into any contract with the plaintiff at any time for any purpose—especially into any contract on the 30th of September, 1901, to employ plaintiff for one year from October 1, 1901, to October 1, 1902, and that in consideration of his services he was to receive $3,500 per year.

It averred that by the terms of its charter the authority to employ all persons was vested in its board of directors, and that said board neither themselves employed, nor did

they authorize any one to enter into the contract of employment sued on, nor did they authorize or enter into any contract at any time with, the plaintiff.

In the event that the court should hold that the plaintiff had a contract of employment with the defendant, it averred that, whatever the nature of the contract was— whether under contract by the year, month, week, or day—it admitted that it had dismissed plaintiff from its service, but averred that said discharge was for just and sufficient reasons, which were assigned in a letter addressed to the plaintiff, which it annexed to its answer. That there were other causes for the discharge, not enumerated in the letter. That plaintiff was discharged as soon as sufficient facts came to its knowledge, in its opinion, to warrant the same, and other causes had become known to it since the discharge.

That, to avoid any unnecessary harshness to the plaintiff, it had, prior to plaintiff's discharge, given him on the 5th of May, 1902, an opportunity to resign his position, failing in which he was discharged. That on the day of his discharge it tendered him the full amount due him up to and including that day, and he declined it. It denied that the discharge "was due solely to personal malice and the desire to do him harm," and averred that the discharge was justifiable and necessary to the proper conduct of its business, and that his dismissal was directed by a resolution of the board of directors.

The district court rendered judgment in favor of the plaintiff for the sum of $1,453.-80, with interest from judicial demand, and for the additional sum of $500, with interest from the date of judgment; assigning written reasons for the same.

Defendant appealed.

Plaintiff answered the appeal, praying that the amount of damages be increased up to the amount claimed.

### Opinion.

The first position taken by the defendant, and for which it strenuously contends, is that there never was a contract between itself and the plaintiff by which it agreed to employ the latter as manager for one year, commencing October 1, 1901, and ending October 1, 1902. It denies that its president, J. V. Allain, was authorized to make that contract, or any one of that character, by a resolution of its board of directors, and denies that any ratification was made of it by that board. It maintains that the fifth article of its charter declares that all "the corporate powers of the corporation shall be vested in and exercised by a board of directors of four stockholders," and this article of the charter withdraws by its terms from the president any right or authority to act for or on behalf of the corporation.

The general rule in reference to the extent of the authority of agents of corporations is thus stated by Morawetz on Private Corporations, vol. 1, §§ 509, 538:

"The extent of the powers of agents of a well-defined class, such as presidents, directors, or cashiers, is determined largely by general custom, of which the courts will take judicial notice; and parties dealing with such agents are entitled to assume that they possess all the powers which are usually accorded to agents of the class to which they belong.

"The authority of the subordinate agents of a corporation often depends upon the course of dealing which the company or its directors have sanctioned. It may be established without reference to the official record of the proceedings of the board, by proof of the usages which the company has permitted to grow up in its business, and of the acquiescence of the board charged with the duty of supervising and controlling the company's business."

"There can be no doubt that the board of directors may invest the president with authority to act as chief executive officer of the company. This may be done either by an express resolution, or by acquiescence in a course of dealing. A person dealing with the president of a corporation in the usual manner, and within the powers which the president has been accustomed to exercise without the assent of the directors, would be entitled to assume that the president had actually been invested with those powers."

We have had occasion recently, in the case of Blanc v. Germania Bank, 38 South. 537,[1] to apply the law on this particular subject. We are of the opinion that the plaintiff was legally employed by J. V. Allain, president of the defendant company, for the year commencing October 1, 1901, and ending October 1, 1902, at $3,500.

To the misconception of this legal situation by the defendant we ascribe the breaking off of the relations between itself and the plaintiff, for we feel satisfied that, had the board of directors believed plaintiff had a contract of employment for a fixed time, it would have permitted the same to be carried out to the extent of the term.

P. L. Cusachs, whose name stands at the head of the defendant corporation, owned and conducted for a great many years a retail drug store at the corner of Baronne and Canal streets, in New Orleans. He died in 1896, and the plaintiff had been continuously in his employ since 1880. He left at his death a widow and five children. His property amounted to about $17,000, while his debts about equaled the value of the property. The stock in the store was worth about $10,000, and the debts of the store equaled, as to amount, the value of the stock of goods.

Very shortly after Cusachs' death, his immediate family, joined by Mrs. Cusachs' brother J. V. Allain, organized the defendant corporation, evidently to obtain the benefit of the limited liability attached to membership therein. J. V. Allain, to whom all the family seem to have been greatly attached, and in whom they had the most implicit confidence, was made president of the corporation, and one of its directors; Mrs. Cusachs and several other members of the family being also directors. The minutes show that there was no meeting of the

[1] Ante, p. 739.

board after the first meeting in 1896 until one was held in May, 1902, at which date new outside parties became stockholders. During that same period a number of "meetings of stockholders" were held, which, tested by legal rules, were no meetings at all. Shortly after the creation of the corporation, J. V. Allain, its president, entered into a contract with the plaintiff for a limited period, as manager of the establishment, and this contract was confirmed by the board of directors. At its termination, Allain, as president, made each successive year a contract with the plaintiff for one year as manager; the last contract being for one year from October 1, 1901, to October 1, 1902, at a salary of $3,500 a year.

Allain remained president and director up to May, 1902, and during that whole period the drug store, though the property of a corporation, was conducted and operated precisely as if it had been held in individual joint ownership, to the knowledge of, and by the consent of, all parties.

No by-laws were adopted by the board of directors, and everything was left uncontrolled in the hands of Mr. Allain. The latter had great confidence in the plaintiff, and the most cordial relations existed between them. Precisely what duties were assigned by Mr. Allain to the plaintiff, and precisely what duties he reserved to or imposed upon himself, do not appear in the evidence. He had charge of the office, however, and it is shown that he appointed the bookkeeper, and had general charge of the business of the concern. In 1900 he seems to have lost his health, and in the beginning of 1902 gave a power of attorney to Messrs. H. L. Favrot and A. Penn to represent him or to aid and assist him in the discharge of his duties. Mrs. Cusachs joined in the power of attorney. Simultaneously, or nearly so, at a meeting of the stockholders of the company these gentlemen were appointed "general managers." They were not connected with the corporation, and their services were given as friends and relatives. They presented the power of attorney referred to and the resolution adopted at the stockholders' meeting to plaintiff, telling him at the time "that the only desire they had was to let matters stand just where they were; that they did not want to interfere with the running of the store, or anything of the sort, and that they hoped he would give them all the assistance he could; that they wanted to familiarize themselves with the business." He replied "that he would gladly co-operate with them."

The plaintiff, under the circumstances, did not consider himself either displaced or reduced to the situation of a head clerk, or that his salary or employment was to be in any way affected. Therefore he made no complaint. Matters went on as before, with relations unbroken, although Messrs. Favrot and Penn, to a certain extent, participated in the business of the establishment, familiarizing (or attempting to familiarize themselves) with it, and calling on the plaintiff from time to time for details and information. On or about the 5th of May, 1902, Messrs. Wm. L. Hughes (acting for himself and an aunt), Charles Favrot, and Dr. Wallace Wood bought from various members of the Cusachs family about one-half of the stock of the corporation, and at once convened a directors' meeting, whose action they controlled. Hughes was elected president at the meeting. One of the first things done after this change in the situation was an authorization given to Messrs. Favrot and Penn to call for plaintiff's resignation. He was accordingly asked to resign, but, having declined to do so, assigning as a reason his contract rights, he was, by resolution of the board, discharged, and this suit followed. In the letter discharging him, reasons were assigned for the action which plaintiff asserts greatly injured his credit and reputation, and for which he asks a judgment for damages.

The reasons assigned were set out in the following letter:

"New Orleans, La., May 8th, 1902.

"Confidential.

"Mr. Henry Berlin, c/o P. L. Cusachs, Ltd. City—Dear Sir: The Board of Directors of the P. L. Cusachs, Ltd. instruct me to say that in requesting that you place the position held by you at their disposal they had intended simply accepting your resignation if you had so elected to tender it. Since you have requested that they serve you with formal written notice to leave the employ of the Company with reasons why your services should be dispensed with, they desire that you should be relieved from your employment immediately. The causes which they wish me to enumerate at present for dispensing with your services are:

"1st. They have not the confidence in your ability to manage properly and to their satisfaction the business conducted by this corporation.

"2nd. They view with regret the mismanagement that has marked your administration.

"3rd. They are confronted with your admitted reluctance or inability to carry out wished for reforms.

"4th. They are confronted with numerous complaints from customers relative to service and discourtesy of employees.

"5th. They are confronted with the looseness of internal discipline, with the untidyness of the establishment, with the disordered condition of its stock, with the waste of material, with the unauthorized disposition of corporation assets, with dilatoriness in carrying out instructions, and for these reasons, as well as others, of which they have at present only an intimation, they request you, on receipt of this, to sever your connection with the establishment and to turn over all keys or properties in your hands to Mr. F. D. Clark who is instructed to receive the same, and such pay as is due you to date you are instructed to get from Mr. Dugazon on presentation of the within order.

"Respectfully, H. L. Favrot,
"Secretary-Treasurer and General Manager,
"P. L. Cusachs, Ltd."

If the board of directors, as newly constituted, had no confidence in plaintiff's ability to manage properly and to its satisfaction the business conducted by the corporation, it had the unquestionable right to sever its relations with him by reason of that fact, but subject to the obligation which the law imposes by article 2749 of the Civil Code for exercising such right without the existence actually of serious grounds of complaint.

That article declares that:

"If without serious ground of complaint a man should send away a laborer whose services he has hired for a certain time, before that time has expired, he shall be bound to pay to such laborer the whole of the salaries which he would have been entitled to receive had the full term of his service arrived."

We are therefore forced to inquire whether defendant's want of confidence was founded upon any serious ground of complaint. Defendant's charge of mismanagement in its second complaint of plaintiff in his administration of the affairs of the corporation is more definitely, though still in very general terms, set out in the fifth complaint. On the trial it attempted to establish that, by reason of the matters and things complained of, the business of the corporation had been impaired.

William L. Hughes, the present president of the defendant corporation, was placed on the stand by plaintiff himself. He acquired his own stock and stock for his aunt in the spring of 1902, just before he was elected president, and plaintiff was discharged. His testimony was to the effect that there were a number of stockholders who then came into the concern. Some of the Cusachs sold out, and other stockholders came in, and then a reorganization of the board of directors followed, of which he became one. At the time of testifying he was the owner of 20 shares. He must have acquired them from the Cusachs, as they were the only ones who held them. Several parties besides himself purchased. He had acquired more than 20 shares. He had disposed of 20 of these shares to Mr. H. L. Favrot, Dr. Wood, and his aunt Mrs. Bohne; also acquired stock about May of 1902. Of the Cusachs family, only two remained in the corporation— Mrs. Cusachs and her daughter Mrs. Phelps.

Witness purchased his stock in 1902 at 100 per cent. above par. The par value per share was $50. The parties were advised as to the business conditions of the company— as to its assets. He was advised of the gen-

eral conditions; that it was doing a very fair business; that one of the advantages that might be gained out of it would be to infuse new blood into the concern. His recollection was that there was some surplus there, and cash; that the assets showed the nominal capital plus the cash. It showed about what they paid for the stock. The company was capitalized at $10,000. The surplus then was in the neighborhood of about six or seven thousand dollars. The parties thought the business showed a pretty good investment at that price, provided they could get the management. The management was not entirely satisfactory. In fact, they thought the business could be improved on, so they went in and bought about 49 ·or 50 per cent. of the stock. All this, in a great measure, took place before they bought. Witness personally made no investigation. His informant was his partner, Mr. Favrot. Witness believed he got his general information from Mr. Penn. He himself never did investigate. The parties had a great deal of confidence, and he himself still had, in Mr. Favrot; and they saw certain opportunities there, as they thought, to improve the business. He assumed they had investigated it. They did not make a special report to him, but they did tell witness, in a general way, what the business was doing; and they gave him sufficient information to lead him to believe that the investment was a good one, and witness recommended some of his friends to go into it, and he showed his appreciation of it by going in himself. The investment was, to a certain extent, based on what the business was, but particularly on the future. Witness had a conversation with Mr. Favrot and Mr. Penn. Whether it was at their suggestion or on his own, he could not remember, but, in a general way, the thing came about. His firm (Hughes & Favrot) had been doing business with the Cusachs for a number of years, and just how the condition came about by which this purchase was made, or how the Cusachs came to sell, he could not say, any more than that the opportunity presented itself, and, after hearing what Mr. Favrot had to say about it, witness recommended his friends putting in money, and, up to the present time, none of them had regretted it. Witness did not make any special investigations. If he had gone into Cusachs' two or three times and found nobody in the place, he would probably not have put his money in it. He informed himself sufficiently, he thought.

This testimony as to the condition of things in May, 1902, just before the plaintiff was discharged, and just before this large amount of stock was bought, negatives the bad condition of the business and the very bad condition of things existing at that time; and, in that connection, it may be said that that bad condition of things, if it existed, arose from things in the past, which were permitted by Messrs. Favrot and Penn to continue unchecked and unremedied from January, 1902, to May, 1902. It is evident from the testimony that many of the matters complained of were exaggerated, and that the board was not warranted in charging bad past conditions, even if they existed, to Mr. Berlin. Many of the matters complained of were matters with which he was not chargeable. For instance, he was not responsible for the books or the bookkeeper. He had charge of the drug department. Matters were unwarrantably permitted to drift, if things were as bad as it is now claimed they were. Being examined as to what the duties of Mr. Penn and himself were, and how and why it was that he and Mr. Penn took no action in these various matters, Mr. Favrot said:

"My appointment was from January to May. Mr. Penn and myself were jointly appointed general managers. We undertook the trust more for the purpose of trying to ascertain why it was that the business was not paying more dividends to the stockholders. That seemed to be the greatest complaint. It came from Mrs. Cusachs and the Cusachs children. I was ap-

pointed in January, 1902, for the purpose of keeping a general supervision over the business. Mr. Penn and myself tried to ascertain exactly what was being done in the inside business of the establishment. We did not know what special duties were incumbent on Mr. Berlin. We only understand them to be so. He was then managing the business."

Witness had known since 1896 that he was general manager of the place. He thought Mr. Berlin was practically in supreme authority. He found him in supreme authority in 1902. Mr. Berlin went to the bookkeeper and all the different people, and told them to recognize him as general manager. He relieved himself of the trust generally, and put it on witness' shoulders, but neither he nor Mr. Penn undertook to take charge of the establishment in any of the immediate details.

"We felt we were only there in a supervisory way. I did not discharge the boys [two boys who were fighting in the establishment in witness' presence, plaintiff being absent], because I considered that both my position and Mr. Penn's, in the establishment, after January, 1902, was generally one of supervision, more than one interfering with the immediate discipline or internal regulations of the establishment, and we never tried to do so, beyond what we considered necessary to do. We certainly had a great many arguments—a great many differences, probably—about what it was necessary or wise to do for the purpose of managing the establishment."

Witness did not feel that he ought to go in there and summarily fire anybody, to Mr. Berlin's detriment, or to try in any way to minimize his authority in the establishment.

The witness, being asked, "Under what direction during this period [between January and May] was the general management of the business?" answered:

"That is not an easy question to answer. The general direction of the business was invested in Mr. Penn and myself. The immediate management was in Mr. Berlin. As a matter of fact, he had everything in his charge. He was the manager, really. We did not know with sufficiency anything about the business."

They were there he understood, in general supervision of Mr. Berlin himself. So far as witness knew, Mr. Berlin had complete authority.

The witness, having stated that a complaint had been made to him by a Dr. Miller "as to the way in which the business of the store was run," was asked whether he had told Mr. Berlin of the same, and replied:

"No, sir; we were then contemplating discharging Mr. Berlin, when the complaint was made."

Speaking of the latter, he said:

"I simply did not feel he was the proper person in that establishment. I feel that he lacks executive ability in the management of an establishment like that, but I have no feeling on earth against him, and I have never questioned his honesty."

Defendant's counsel asked the witness, "Having learned these facts, you and Mr. Penn have testified to, what did you then do?" and he answered:

"Well, that is a difficult question to answer. We really did nothing. The board ordered his discharge. It was not the same board which had given me general authority to act."

Being asked why, having the power and authority to act as general manager from Mrs. Cusachs and Mr. Allain, he needed a resolution of the board of directors to eject these men, he answered that he preferred it simply because, when he started in that thing with full power, he preferred to start with help he had of his own, or employed by authority.

Referring to Mr. Berlin's discharge, witness said:

"There was no question arising as to Mr. Berlin's employment or contract existing during the time Mr. Penn and he were in there, and they never contemplated getting rid of Mr. Berlin, in any way, shape, or form. They were perfectly willing, and it was perfectly agreeable to us, that Mr. Berlin should continue as long as he was giving satisfaction, and we were willing to continue in that way; but there came the time when the proposition was made to sell out one-half of the stock of this company, and the thing culminated, you might say, in the space of a few days, and this whole transfer was made here in the space of a very few days; and, further, the thing was made and a new board of directors was elected upon the strength of the old concern; and the question of who was going to manage the company for the new organization, you might say, came up before the new board, and then it was discussed whether

Mr. Berlin would manage the affairs of the establishment under the reorganization, as you might call it. In the general discussion it was decided that Mr. Berlin's resignation should be asked for."

Being asked whether he informed Mr. Berlin how far his powers went, witness answered, "No;" he was not quite sure he knew himself, to be perfectly frank. He had the resolution of the board, whatever that was. He was then asked:

"When you spoke to Mr. Berlin of any disorganization or want of discipline, was it simply as an adviser, or was it in an authoritative tone of voice?"

He answered:

"During all the term of this contract or this arrangement by which I was, jointly with Mr. Penn, the manager of this establishment, I contemplated our relations to be passable with Mr. Berlin. For a while I tried to give him more advice than anything else. I invited his attention to all the things that required attention. I never considered it necessary, nor did I consider it wise, to give Mr. Berlin any orders. I am frank to say that I knew nothing about the drug business, and I felt in a great many instances I would have to depend on Mr. Berlin, if he was to remain in that position, to help and even, perhaps, to advise me, in a great many things connected with it. The matters of which I had to complain, I think, in all instances, arose not from faults that might arise from expert knowledge of the drug business, but from faults that appeared to be apparent to any person who had knowledge of any general business.

"Q. Then, practically, he received no instruction from you?

"A. Yes, sir; he did receive some instructions in the way of requests.

"Q. Well, now, you must draw a distinction between a request and an instruction. You must remember he was a general manager there himself, and I want to know, positively, was it a request or an instruction. I understand you to say you advised Mr. Berlin?

"A. That comes from Mr. Berlin's interpretation.

"Q. Well, whatever was the language you used.

"A. I don't think I ever told Mr. Berlin, 'You have got to do this,' or, 'You have got to do the other things,' except perhaps in one or two instances.

"Q. What were they?

"A. I believe I gave Mr. Berlin a definite order—as a matter of fact, I know we gave Mr. Berlin a definite order—to make his purchase in a different way. That has already been testified to.

"Q. And that he declined to carry out?

"A. Yes, sir; then we gave him definite orders to put in vogue the check system.

"Q. He did not put that in vogue?

"A. Yes, sir; he put that in vogue.

"Q. You cannot cite that as a violation.

"A. You asked me what orders I gave him.

"Q. He complied with these orders?

"A. Yes, sir.

"Q. And the only order he did not comply with was the one relative to buying stock?

"A. Yes, sir.

"Q. Therefore, when you say in your answer, 'dilatoriness in carrying out instructions,' he never actually received any instructions but two, one of which he obeyed.

"A. Yes, sir; he got other instructions, which might not have been in the form of absolute orders, but they were instructions nevertheless.

"Q. Can you give them?

"A. I cannot recall them just now."

In reference to the matter concerning the manner of making purchases, it is wrong to say that the plaintiff violated any orders. He called upon several wholesale and drug houses with a view of carrying out the suggestions which had been made on that subject; but the managers said it was not feasible, and plaintiff so reported, and the matter was not seriously insisted upon. Mr. Berlin reported that the wholesale houses had a compact between each other as to prices, and they would not undersell each other.

In the letter written to the plaintiff on that subject, Messrs. Favrot and Penn say:

"Mr. Penn and myself in consultation have come to the conclusion that we would wish to take advantage of the best prices offered by the wholesale dealers in drugs to the retail trade, and in accordance therewith we will request that at the beginning of each week hereafter you submit," etc.

Mr. Favrot, testifying as to the advice he had given to buy stock in the corporation, said that he felt that the corner—the conditions at that corner were amply sufficient to justify anybody going into business and making a success. He knew it to be a good corner. He based no opinion as to the condition of the store for the purpose of making any of these purchases. He did not advise them to purchase on the faith of any condition that existed in the store at the time. His advice was exclusively based upon what the probabilities of the place might be if it got some management—some energy and vim in

it. Later he said his advice was based entirely on an examination of the books.

Mr. Penn's testimony did not differ materially from that of Mr. Favrot. Referring to the letter of the 28th of February, written to the plaintiff, he said it was written because of his failure to comply with the requests made of him; that "he wanted him to be on record in regard to what he asked him."

Our conclusion from the whole evidence is that, from the manner in which Messrs. Favrot and Penn dealt with the plaintiff, the latter was led to the belief that action upon the suggestions made to him was left to his final decision, and that he violated no orders which had been given to him; that, but for the fact that new stockholders outside of the Cusachs family had entered into the corporation, Berlin's contract would have been left to run its course; that when these stockholders organized a new board of directors the latter, in calling for the resignation of the plaintiff, acted upon the assumption that he had no contract for a fixed time, and dealt with him also upon the assumption that the corporation had practically been reorganized, and they were, so far as plaintiff was concerned, exercising a right of selection or retention, rather than discharge, but that when he declined to resign they felt they had gone too far to recede and discharged him. This they had the right to do, subject to the legal consequences flowing from the discharge. We do not think that, under the circumstances of the discharge, plaintiff had a cause for damages. The defendant exercised a legal right with consequences fixed by law. It was not responsible for remote, collateral consequences resulting from unauthorized inferences or deductions which physicians might draw from the fact itself of discharge. Dugue v. Levy (recently decided) 38 South. 410.[2] The discharge was accompanied by

nothing of a libelous character which would give an independent cause of action. The portion of the judgment decreeing damages in favor of plaintiff against the defendant is erroneous, and must be reversed.

For the reasons herein assigned, it is ordered, adjudged, and decreed that that portion of the judgment appealed from which decrees that plaintiff recover $500 against the defendant in damages be, and the same is hereby, annulled, avoided, and reversed, but, after being so altered, it is hereby affirmed; appellee to pay costs of appeal.