No. 3389

Second Circuit

HARRIS v. H. C. TALTON WHOLESALE
GROCERY CO., INC.

(July 1, 1929. Opinion and Decree.)

A. S. Drew, of Minden, attorney for
plaintiff, appellee.

Coleman Lindsey, of Minden, attorney
for defendant, appellant.

ODOM, J. Plaintiff is the holder and
owner of a promissory note of the defend-
ant corporation, executed and signed by

its general manager Upon defendant's refusal to pay the balance due on the note, plaintiff brought this suit.

The defense is three-fold. First, that S. H. McCrary, who signed the note for the corporation, was not authorized to do so by the board of directors, and that the note was made without the knowledge or consent of the stockholders; second, that the note is without consideration; and third, that if it should be held that the note was executed with defendant's authority, then the transaction which resulted in the execution of the note was ultra vires the powers of the corporation. From an adverse judgment, defendant appealed.

## OPINION

We dispose of the defenses in the order named:

(1) The defendant is a mercantile corporation organized under the laws of this State, its objects and purposes as stated in the charter being to buy and sell merchandise at wholesale and retail, to buy and sell cotton, cottonseed and fertilizers and to own or lease real estate when incident to its business, and to borrow money when necessary, and to pledge the property of the corporation as security when required; and "to do any and all things incident or necessary to the conduct of the business," and, as elsewhere stated in the charter, "to do and perform any and all acts in furtherance of its interests when not prohibited by law."

The corporation was organized by three persons: H. C. Talton, Helen Gray and S. H. McCrary, who subscribed for all of the stock—Talton taking 200 shares, Miss Gray one share and McCrary 49 shares. Miss Gray seems to have dropped out, and on the date this note was executed,

August 5, 1927, there were four stockholders, to-wit: H. C. Talton, who owned $13,500 of the stock; S. H. McCrary, who owned $8,500; I. G. Duke, who owned $500, and Mr. Woolf, who owned $1,000 of the stock. These were the only stockholders and were members of the board of directors, with Talton as president; McCrary, general manager, and Duke, secretary and bookkeeper.

As a matter of custom, habit and practice, the board of directors, as such, took no stock or interest in the conducting of the affairs of the corporation. Only one meeting a year was held and that for the purpose only of electing officers. Talton, as president, and McCrary, as general manager, the chief stockholders, were entrusted with the entire management of the concern. McCrary, as general manager, stayed in the office, did all the buying, conducted the business generally, employed the help with little if any advice or assistance from the others, signed notes evidencing the indebtedness of the corporation, and signed checks for and in its name. There is some evidence that McCrary at times consulted Talton, and possibly Duke, with reference to the signing of some of the notes. Talton and Woolf were outside salesmen and spent but little time in or about the place of business. Duke stayed in the office and kept the books, but neither he nor the other stockholder, Woolf, took the slightest interest in the conduct of the business. They left everything to Talton and McCrary. The board of directors was never called together to authorize or ratify any business transaction.

About the 1st of August, 1927, the plaintiff, Harris, who represented the New York Life Insurance Company as local agent, called on McCrary and suggested that it would be good business for the corporation to procure insurance on the

lives of both Talton and McCrary, with the corporation as beneficiary. McCrary looked with favor upon the proposition and suggested to Harris that he see Talton, which he did. Talton also approved, but told Harris that the corporation had no money at that season of the year with which to pay premiums on policies. Harris then told Talton that he would pay the premiums personally and carry the amount as an indebtedness against the corporation until January 1st, following. To this, both Talton and McCrary assented. Whereupon Talton and McCrary signed applications, each for a policy of $10,000, on their lives, with the defendant corporation as beneficiary. The applications were accepted, the policies issued and delivered to the corporation and deposited in its safe, where they remained until this case was tried.

To carry out the contract as agreed upon, Harris personally paid the premiums on the policies to the New York Life Insurance Company and gave to Talton and McCrary receipts showing that the premiums on the policies were paid for one year. As evidence of the indebtedness of the corporation to Harris for the amount which he advanced to pay the premiums, the note sued on was made. The note was written out by Duke, the bookkeeper, stockholder and director, and McCrary, the general manager, signed it with the corporation's stamp as follows: "H. C. Talton Wholesale Grocery Co., Inc.," underneath which he wrote: "By S. H. McCrary."

Duke says he understood the transaction, knew what the note was for and, while he took no part, except to write the note as he was directed, he interposed no objection, then or later. Talton was not present when the note was made out and signed, and now says that he knew nothing of its existence until it was presented for payment. But, he says that he recognized all along that the corporation was justly indebted for the amount of the premiums on the policies, and further, that he considered the transaction good business policy for the corporation. Duke, the bookkeeper, says that this note to Harris was carried on the books of the corporation as a liability under the head of "bills payable" and that the books were at all times open to Talton for inspection, although he does not know whether Talton examined the books and saw such entry. Duke further testified that at the regular meeting of the board of directors in January, before the note was presented for payment, nothing was said about it by anyone—it was never repudiated.

As already stated, Talton does not deny, but in fact admits the debt, but he, as president, defends on the technical ground that McCrary had no authority from the board of directors to sign the note. It seems to us, however, that if the corporation had power to create the debt, McCrary, under the general practice, was authorized to execute the note evidencing the debt.

Harris presented the note to Talton in January, at which time he denied any knowledge of its existence, but had the corporation pay Harris the amount of the premium on his own policy, but refused to pay the balance, being the amount of the premium on the policy on the life of McCrary, for the reason that McCrary was no longer connected with the corporation, having severed his connection with it some time after the policies were written. However, he suggested to Harris that he go to McCrary and get him to pay the balance, and, when this suit was called for trial, the defendant corporation

tendered to Harris $151.25, which tender was refused.

Now under these circumstances, can the corporation, represented in this suit by Talton, the president, be heard to repudiate this note on the ground that McCrary had no authority to make it? We do not think so.

True, the board of directors did not by formal action authorize the making of the note by McCrary, the general manager. But it had entrusted the entire management of the concern to McCrary who signed other notes and all checks for it without express authority, and none of his acts were ever repudiated or even questioned. By custom and practice, all similar matters, were left in his hands. Not only that, but the transaction was tacitly approved by Talton, McCrary and Duke—three of the four stockholders and directors, each of whom knew all of the facts, and, while Talton says that he did not know that the note was in existence, yet he admits that the corporation owed the debt.

It is not always necessary that the acts of an officer of a corporation, if not ultra vires, be formally authorized by its board of directors. An officer, such as the general manager, may lawfully bind a corporation where similar acts of his have been approved and sanctioned by the stockholders and members of the board as a general practice, custom and policy. The authority of its officers often and frequently depends upon the course of dealings which the corporation or its directors have sanctioned. The latest expression in point by our own courts which we have been able to find is the case of Gueydan vs. T. P. Ranch Co., 156 La. 397, 100 So. 541, where the court said:

"It is a familiar principle in law that it is not always necessary to show the authority of an officer of a corporation by a resolution of its board of directors. A corporation may not, any more than an individual, reap the benefits flowing from the acts of its officers and repudiate the obligations arising from the same acts. Berlin v. Cusachs, Ltd., 114 La. 744, 38 So. 539; Gair v. Columbia Rice Company, 124 La. 194, 50 So. 8; Boudreaux v. Feibleman, 105 La. 404, 29 So. 881. A course of conduct pursued by a corporation for many years, in permitting an officer to do an authorized act, is an acquiescence in such act and creates an estoppel."

In addition, we cite Haas vs. Gumbel & Co., 155 La. 414, 99 So. 350; Blanc vs. Germania Natl. Bank, 114 La. 739, 38 So. 537.

(2 and 3) The defenses that the note was without consideration and that the acts of the corporation in taking the insurance on the lives of Talton and McCrary, and the giving of the note were ultra vires must likewise fall.

The consideration of the note was money advanced by Harris to pay the premiums on the policies. The note was not given for the premiums, but for money which Harris advanced to pay them. The corporation agreed that Harris should pay the premiums and agreed to reimburse him for the amount, so that the transaction with reference to the note was in the nature of a loan or an advance by Harris to the corporation, and constituted a separate contract.

But if it be said that the note was given for the premiums, the protection afforded by the insurance was sufficient consideration for the note. This point is practically conceded by counsel for defendant in his brief, but he argues that the corporation had no insurable interest in McCrary after he severed his connec-

tion with it. That is true, but, as already stated, the consideration of the note sued on is money advanced by Harris for the corporation which it agreed to pay.

On the question of ultra vires, we find that the charter provides that the corporation, in addition to its other powers, is given general power and authority "to do any and all things incident or necessary to the conduct of its business," and, as stated in Article 8, may "do and perform any and all acts in furtherance of its interest when not prohibited by law."

Talton and McCrary were not only the chief stockholders of the corporation, but they were its chief officers and sole managers. Upon them depended the success of the business. Their ability to successfully conduct the affairs of the corporation was one of its assets, and probably, as is sometimes the case in corporations like this, its main asset. If either had died, it would necessarily have suffered serious loss. The corporation therefore, had an insurable interest in each of them, and under its powers could do any act "in furtherance of its interest when not prohibited by law." The act of taking the insurance is not prohibited by law and we think was in furtherance of its interest, as much so as the taking of fire insurance on its real and personal property. The corporation had no by-laws and there is no specific authority in the charter for taking fire insurance on its property. But it would hardly be contended, we think, that the corporation could not under its implied powers bind itself for the premiums on a fire insurance policy. The taking of such insurance is incidental and necessary and in furtherance of its interest.

In the case of United States vs. Hardware Co., 68 Law Ed. 970, 265 U. S. 189, 195, 44 Sup. Ct. Rep. 546, 548, Chief Justice Taft, the organ of the court, had this to say:

"Life insurance in such a case as the one before us is valid, and is not a wagering contract. There was certainly an insurable interest on the part of the Company in the life of Biddle. * * * Life Insurance in such a case is like that of fire and marine insurance—a contract of indemnity. * * * The benefit to be gained by death has no periodicity. It is a substitution of money value for something permanently lost, either in a house, a ship or a life. * * *"

In the case of Mutual Life Insurance Co. of New York vs. Board, Armstrong & Co., 115 Va. 836, 80 S. E. 565 (L. R. A. 1915-F, 979), the Supreme Court of Virginia held, to quote the syllabus in L. R. A.:

"Insurance by a corporation for its own benefit of the life of its president and general manager, to protect itself from loss in case of his death, is not ultra vires nor contrary to public policy.

"A corporation has an insurable interest in the life of its president and general manager, whose death would result in a serious and substantial loss to its creditors and all others interested in its prosperity."

The judgment appealed from is correct, and is accordingly affirmed with costs.