(48 South. 322.)

No. 17,172.

CRUSEL v. HOUSSIERE–LATREILLE OIL CO.

(Jan. 4, 1909. Rehearing Denied Feb. 15, 1909.)

1. JUDGMENT (§ 253*)—CONFORMITY TO PLEADINGS.

Where, in a suit to recover compensation for services rendered under an alleged contract, plaintiff having offered evidence to establish the contract alleged, and defendant having offered evidence to prove that, under the alleged contract as interpreted by it, the compensation was fixed at a lower rate than that claimed, plaintiff acquiesces in such interpretation, and proves that otherwise the alleged contract was fully executed by him, he is entitled, under his prayer for "general relief," to judgment for compensation on the basis established by such interpretation and acquiescence, and will not be driven to another suit for the recovery of the same.

[Ed. Note.—For other cases, see Judgment, Dec. Dig. § 253.*]

2. CORPORATIONS (§ 406*) — CONTRACTS OF GENERAL MANAGER—RATIFICATION.

Where the business of a corporation, composed of a few persons, is loosely conducted, mainly by an officer called "general manager," who is urged by the other members to make contracts and incur obligations on behalf of the corporation, pursuant to a policy approved by them, and not ultra vires of the corporation, and, such an obligation having been incurred, and the consideration therefor having been accepted by the board of directors, composed of practically all the members of the corporation, and having inured to its benefit, the corporation will be considered bound therefor, originally and also by ratification.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 1611–1614; Dec. Dig. § 406.*]

(Syllabus by the Court.)

Appeal from Twenty-Third Judicial District Court, Parish of St. Mary; Albert Campbell Allen, Judge.

Action by J. Edward Crusel against the Houssiere-Latreille Oil Company. Judgment for defendant, and plaintiff appeals. Reversed, and judgment for plaintiff rendered.

Farrar, Jonas, Kruttschnitt & Goldberg and Clegg & Quintero, for appellant. Walter Lemann, Hampden Story, Henry Darley Smith, and Edward Nicholls Pugh, for appellee.

### Statement of the Case.

MONROE, J. Plaintiff alleges, in substance, that defendant agreed with him that, if he would find a person who would enter into a satisfactory contract to exploit for oil certain land of which it was the owner, it would pay him 5 per cent. of all the oil produced under such contract; that he found the person; that the contract was entered into; that more than 3,000,000 barrels of oil have been produced thereunder; that the production is continuing; and that defendant refuses to pay him in accordance with its agreement. Wherefore he prays for an accounting, and for judgment for his compensation, either in oil or money. Defendant filed an exception of "vagueness," whereupon plaintiff filed a supplemental petition, affirming the allegations of the original petition, and further alleging:

"That the contract which petitioner has with the Houssiere-Latreille Oil Company was formed and entered into, first, by conferences and verbal agreement between your petitioner and Donelson Caffery, Jr., the general manager of the Houssiere-Latreille Oil Company, on or about the latter part of December, 1903, and the matter of these conferences and the terms of this agreement were subsequently made known to Donelson Caffery, Sr., the president of said com-

pany, to Eugene Houssiere, its vice president, and to J. Sully Martel, its secretary-treasurer, and were approved, accepted, and acted upon by them. That the terms of said contract between your petitioner and the Houssiere-Latreille Oil Company were further discussed and ratified in various letters which passed between your petitioner and the officers of the Houssiere-Latreille Oil Company, and more particularly the following letters [specifying certain letters], copies of which letters are hereto annexed and made part hereof. And petitioner further shows that at a conference held on or about the 29th of March, 1904, between the representatives of the Houssiere-Latreille Oil Company, the representatives of the Texas Company, and your petitioner, the terms of the contract between your petitioner and the Houssiere-Latreille Oil Company were again fully and clearly laid before the president, vice president, secretary-treasurer, and general manager of the Houssiere-Latreille Oil Company, who, with knowledge of said contract with your petitioner, entered into a lease * * * with the Texas Company whereby the said officers, for the Houssiere-Latreille Oil Company, accepted, ratified, acted upon, and availed themselves of the services of your petitioner, rendered under the said contract, in the obtaining of the said lease."

He prays as in the original petition, and, further, for the reservation of his future rights. An exception of "no cause of action" was filed, and overruled (or referred to the merits). Defendant then filed a "general denial," and there was a trial, in which it was shown that in 1902 Eugene Houssiere, Arthur Latreille, Donelson Caffery, Donelson Caffery, Jr., and J. Sully Martel owned, in indivision, a tract of what was supposed to be oil-bearing land, and that they were exceedingly anxious to find some one who would furnish the money to develop it; that the situation was complicated by reason of the fact that there was a suit pending concerning the title to the land, and another pending or threatened, in which other parties were claiming rights as lessees, so that it was considered necessary to find a strong party to take hold of the matter; that, at the instance of Martel, plaintiff brought him and his associates into negotiations with the Texas Company, but that, a contract having been sent to that company for signature which was not in accordance with its understanding, the negotiations were broken off; that the parties thereafter endeavored to contract directly with the Texas Company, but without success, as appears from the following testimony, given by D. Caffery, Jr., to wit:

"The result was that the Texas Company declined to lease the property or to make any contract with us concerning it. We had gone to the Texas Company to induce them to operate on this land. Senator Caffery and I met Mr. Cullinan [president of the Texas Company] in Beaumont, and went over the matter with him, and the Texas Company had declined to take up the proposition."

On May 5, 1903, Houssiere, Latreille, the Messrs. Caffery, and Martel (together with Ismerie Latreille, whom we take to be the wife of Arthur Latreille) incorporated themselves, under the name of the Houssiere-Latreille Oil Company, with D. Caffery, president, Houssiere, vice president, Latreille, second vice president, Martel, secretary-treasurer, and D. Caffery, Jr., general manager; said parties constituting at once the board of directors and (Madame Latreille excepted) the whole body of the stockholders. According to the charter there ought to have been regular meetings of the board of directors once in three months, and there might have been special meetings when called by the president, of his own motion or at the request of two directors. As a matter of fact the first meeting of the board was not held until December 3, 1903, seven months after the incorporation of the company, after which, there were eight meetings in 1904, one in 1905, none in 1906, one in April, 1907, and none thereafter up to the date of the trial of this case in May, 1908. In the meanwhile business, involving large amounts of money and the most vital interests of the company, had been transacted and several of the meetings had done nothing but ratify the previously taken action of the officers to whom the management of the affairs of the company had by common consent been intrusted;

the facts being that the Messrs. Caffery and Martel are prominent members of the bar of this state and court, whilst Houssiere and Latreille, though the original owners of the land in question and the owners of nearly four-fifths of the stock of the defendant company, are immigrants from France, who were farming the land when oil was discovered, and did not consider themselves sufficiently familiar with the English language or with business methods to justify them in attempting to handle the situation. The transaction of the business of the company was therefore left to the Messrs. Caffery and Martel, and, though Houssiere and Latreille, and probably Madame Latreille, were advised, informally, of any important action taken or to be taken, it is evident that much was done that does not appear on the minutes of the board of directors, or that appears there as having been approved after it was done. As time wore on, the burden and responsibility of taking the initiative in the matter of the development of the company's land devolved mainly on the general manager, who on November 24, 1903, wrote to plaintiff (with whom he and the others had kept in touch) in part as follows, to wit:

"In case you succeed in interesting any one in the Corkran land [being the land of the company], could you not arrange that the royalty to the landowners shall be a straight half of the oil produced. * * * If some such concern as the Texas Company could be induced to take 10 or 15 acres out of the 40-acre tract, and develop it, we would be willing to make it handsomely worth your while."

His reason for making this offer is stated in his testimony as follows:

"My going to Crusel, or meeting him accidentally, and telling him the result of our interview with Cullinan, was what induced me to take up the matter with him. There was pressure on me, from the other members of the company, to bring about development. The pressure was so great that I determined to make some sort of a commission. I had hoped to bring about the development without paying any commission."

The subject-matter of the letter thus quoted was thereafter further discussed and referred to between plaintiff and the writer, and between plaintiff and Martel, and on February 20, 1904, the writer and plaintiff met in New Orleans, by appointment, and had an extended conversation, in which they came to an understanding as to the terms upon which the Houssiere-Latreille Company was willing to make an "exploiting" or "development" contract, and agreed (or thought they had agreed) upon the compensation that plaintiff was to receive in the event of his producing a satisfactory contractor. Plaintiff made some rough notes at the time of the important points considered, and when the interview ended went to his office and embodied them (as he interpreted the conversation) in a letter to the general manager, bearing even date with the interview, in which he said:

"This is to confirm the conversation between us relative to leasing some of the territory of the Arnaudet-Latreille tract."

He then specified what he understood should be the substance of any contract that he might negotiate between the exploiter (whom he was to find) and the company, and concluded his letter as follows:

"My commission for bringing the above deal about is to be 5 per cent., and, in case that you should have to make concessions, whereby, for yourself and for your co-owners of the land, you should have to take less than 25 per cent. royalty, then I am to take the corresponding decrease in the amount of my commission, which comes out of your 25 per cent."

D. Caffery, Jr., testifying as to this letter, says that he received, but did not reply to, it. He further says:

"I read the confirmatory letter, recently, with special care, and I think he stated what the agreement was, with the exception of there being an ambiguity about his commission. There was no ambiguity in our agreement. * * * Q. Mr. Caffery, what was the agreement and understanding about the commission? A. The agreement was that Mr. Crusel's commission would be 5 per cent. Q. Of what? A. Of what we were to receive, of course.

* * * A. The idea that the 5 per cent. was to be upon the total production of the land never occurred to me until after this suit was instituted. It was presented to me when Mr. Crusel sent me his contract to be signed [referring to some demand made by Crusel, long afterwards]; but it did not come clearly home to me until after the institution of this suit. In other words, it would be giving Mr. Crusel a sixth of the Houssiere-Latreille Oil Company's royalty, and I am sure that Mr. Crusel would not have dared to advance such a proposition as a business man. * * * Q. Then you knew that he was expecting a commission? A. Yes; I expected that he would claim a commission. Q. You had a contract for a commission? A. Yes. Q. For a 5 per cent. commission? A. Yes. Q. That was made in New Orleans? A. Yes. Q. Made in a conversation? A. Yes. Q. And Crusel wrote you a letter which embodied the conversation, on the 20th of February, 1904? A. Yes, sir. * * * Q. You have never denied the contract for Crusel's commission in case he would bring about a deal? A. No, sir; I have never denied it. Q. Did you at any time submit that letter of February 20, 1904, to the board of directors? A. I don't think that I actually submitted that to anybody; but I am quite sure that the matter was discussed with Senator Caffery and Mr. Martel. I do recall several criticisms I received from the Senator for agreeing to the commission, and I do recall that my reply was that there was no other way to reach the Texas Company, and, but for my belief that that was the only way—that belief being brought about by Crusel's statement and what had happened before—but for that belief, I would not have agreed to the commission."

At another place his examination reads:

"Q. Mr. Caffery, did you ever, before the 29th of March, 1904, raise any opposition to the payment of a commission to Crusel, or signify that none was due him, under your contract with him? A. No. sir; I did not, but my impression is that there was always war in the company over the commission. Q. Was that communicated to Crusel? A. No, sir; that was in the company. The war was principally between the Senator and myself, and my recollection is that, when I told him we could not get any contract, except with the Texas people, and that we could not deal with the Texas people except through Crusel, he did not express satisfaction, but he ceased to oppose it."

No war having been declared on him, and not being advised of what was going on among the members of the defendant company, Crusel devoted himself to the business of getting the Texas Company to undertake the development of defendant's land, and on March 15, 1904, being in Beaumont, Tex., he wrote a letter to defendant's general manager, saying (inter alia):

"I have made an appointment to meet you on Saturday morning at Franklin, La. Mr. Freeman will be along, representing the Texas Company. He will also have the manager that company has in the field along, in case his services should be required, relative to the locality of the wells, etc. Mr. Freeman will come over disposed and much inclined to do business, and hopes to find you in the same frame of mind, so that we will accomplish something this time. If this appointment suits you, kindly let me hear from you by return mail."

The general manager not being at Franklin when the letter reached there, Crusel received a reply from Senator Caffery (defendant's president), as follows:

"Your letter of the 15th, to my son, received. He is now in New Orleans, and I will take the appointment with you. I know he will be back in time to meet you and Mr. Freeman on Saturday at the point indicated."

Agreeably to the understanding so reached, Crusel and Freeman, with the field manager of the Texas Company, went to Franklin on the day appointed. D. Caffery, Jr., was unable to be there, and they spent a good part of the day discussing the subject-matter of their errand with Senator Caffery, who, however, declined to enter into any contract, in the absence of the general manager.

On March 23d Mr. Freeman wrote, from Beaumont, to D. Caffery, Jr., saying:

"In pursuance of our engagement with you, through Mr. J. Edw. Crusel, we called to see you last Saturday. Finding you had been unexpectedly called away, we had a very full and pleasant interview with your father and Mr. Martel, in which we discussed pretty fully the terms of agreement that would be mutually satisfactory."

He then recapitulates the proposition that he had submitted, and continues:

"Under date of March 22d I am in receipt of a letter from Mr. J. Edw. Crusel, to the effect that this proposition is acceptable to you and your associates, and that you are willing to close, except as to the one-sixth proposition, and that you think that, after the wells cease to produce by natural pressure, and have

to be pumped, you should have one-fourth, instead of one-fifth, and that, if we are willing to make this concession, you are ready to close, or, if we are willing to make the royalty 30 per cent., all around, from the beginning to the end of the production, without reference to whether the well gushes or has to be pumped, that you would be agreeable to closing the contract on the lines of our talk and as herein outlined. After due consideration, we have decided to accept the proposition, subject to the satisfactory showing as to the legal status, both as to the title and as to the adverse lease claimed to a portion of the land which will be covered by this agreement. I would be pleased, therefore, if you would send us a statement covering the result of the litigation. * * * On hearing from you, in response to this, with the information in hand, we are ready to close the transaction with you, subject, of course, to the concurrence of our attorney as to the legal matters, and to go promptly to work on the leased property, and we will be glad to prepare and submit to you a contract covering the transaction."

And agreeably to the understanding thus arrived at, and to an appointment thereafter made, Mr. Freeman, the secretary, and Mr. Autry, the attorney, of the Texas Company, together with Crusel, in his capacity as broker, reached Franklin early on the morning of March 29th, and after breakfast repaired to the office of the Messrs. Caffery, where they found those gentlemen, together with Martel, Houssiere (in the forenoon), and Latreille (in the afternoon), representing the Houssiere-Latreille Oil Company, and ready to deal with them. There are some discrepancies in the testimony given by the parties thus named as to exactly what took place at the conference which was then held, and as to the precise order of events, and, after comparing the different statements with each other and considering them with reference to that which is known and undisputed and that which is probable, we find the facts to be as follows:

The forenoon was devoted to the discussion of the terms of the proposed contract, which were agreed upon and reduced to writing in the rough. The conference then adjourned and the members went to dinner, leaving to the typewriter the redrafting of the contract for final consideration and signature. The conference reassembled, about 2 o'clock p. m., and the redrafted instrument was shortly afterwards presented, and the parties were ready to sign it, when D. Caffery, Jr., invited Crusel to a private interview in another room, and, the invitation having been accepted, he told Crusel that he and his father had discussed the question of Crusel's commission and (in effect) thought it ought to be reduced. To this suggestion Crusel demurred, saying that he had done the work required under the agreement, and ought not, at the last moment, to be deprived of his reward. There was a good deal of discussion, during which Crusel asked Caffery whether he (meaning the Houssiere-Latreille people) was ready to pay for the work which he (Crusel) had done, and was answered, "No." Caffery, however, said that he would consult his father, with a view, as we take it, of agreeing with the latter upon some definite proposition to be submitted to Crusel, and he did so consult, and, returning, proposed that the amount of Crusel's compensation should be limited to $5,000; that is to say, in the event oil should be found by the Texas Company, Crusel should receive the commission of 5 per cent. until the aggregate should amount to $5,000, which sum should be accepted as payment in full. This proposition Crusel declined to accept, and thereupon President Caffery, or General Manager Caffery, or both, informed the representatives of the Texas Company that, in consequence of a misunderstanding with Crusel as to his compensation, they would go no further with the proposed contract. To that the Texas Company people replied that the question of Mr. Crusel's compensation was one in which they had no interest and did not care to become involved; that they had dealt with him as the agent or broker of the Houssiere-Latreille Company; that he in no sense represented the Texas Company; and that they would withdraw from the con-

ference, leaving the contract, as prepared, for the further consideration of the Houssiere-Latreille Company people, and leaving them to settle their difference with Crusel as they might think proper. They accordingly withdrew, and, hurrying, boarded a train which was about leaving for Beaumont, and Crusel did likewise. After they had gone, Latreille told Martel that he and Houssiere wanted their land developed, that they did not altogether like the idea of leasing as much as 200 acres to one company, and that the proposed allowance for the cost of wells was "considerable;" but, that they wanted their land developed—in other words, that they wanted the proposed contract signed, and thereupon Martel urged upon President Caffery the adoption of that course, and President Caffery yielded the point and requested Martel to wire the Texas Company people to that effect, which the latter did; the telegram reaching Freeman, on the train, at Lafayette, La. (about two hours after he and his associate and Crusel had left Franklin), and reading:

"Contract signed; will reach you to-morrow morning."

This was supplemented by a letter, of even date, signed by President Caffery and reading:

"I inclose you a copy of contract and counter letter [the latter being in accordance with the agreement of the parties whereby the Texas Company was to be held harmless as against certain claims and litigation], duly signed. We decided to accept the contract as it stands, as you will see by copy of resolutions of the board, which I inclose."

D. Caffery, Jr., testifying concerning this phase of the transaction, says:

"Mr. Martel insisted on the contract being completed. The contract itself was not satisfactory to me, nor to Senator Caffery; but Mr. Martel took the position that the other parties interested, Mr. Houssiere and Mr. Latreille, were very anxious to have developments, and that we owed it to them to accept even an unsatisfactory contract. The question of Crusel's commission was considered, as I had postponed everything for the purpose of settling the status

of that question, and we decided that Mr. Crusel would have no claim to any commission, and, after deciding that Mr. Crusel would not be entitled to any commission and that the contract ought to go through, for the best interests of all the members of the company, a telegram was sent to some member of the Texas Company, on board the train, notifying them that it had been accepted by the Houssiere-Latreille Oil Company," etc.

The basis of the conclusion (reached after the interruption of the negotiations and the departure of the Texas Company people and Crusel) that "Crusel would have no claim to any commission" seems to have been the information, conveyed in the statement of the Texas Company people, that Crusel did not represent the Texas Company, and that they had dealt with him as the agent or broker of the Houssiere-Latreille Company.

D. Caffery, Jr., testified at some length upon this subject and upon the subject of his relations with Crusel generally, and we reproduce his testimony in part as follows:

"During the discussion of Mr. Crusel's commission, it developed that the Texas people were not interested in Crusel at all, and one officer of the Texas Company, or perhaps more than one, made the declaration that that was a matter which they did not care to hear, and that they would allow the representatives of the Houssiere-Latreille Oil Company and Mr. Crusel to settle between themselves. That was a development which surprised me very much, and, when that announcement was made, all negotiations stopped, and I notified the parties that there would be no contract. * * * I cannot recall the details of the discussion. All I recall is the salient fact that, after Mr. Crusel was shown up to me by the representatives of the Texas Company, I immediately cut off from him."

Referring to prior dealings between him (and his associates) and plaintiff, the witness says that the Texas Company had "declined to make any contract with them" (meaning the Houssiere-Latreille people), and that he told Crusel so, after which Crusel said, and wrote, that he had parties who would, as he thought, be willing to do certain things looking to the sale or development of the Houssiere-Latreille land. "My recollection," says the witness, "is that his principal in the matter" (referring to some one of the proposi-

tions) "was the Texas Company. I think Mr. Crusel stated that he expected to deal with the Texas Company—to get the Texas Company interested in the land. * * *" He then refers to letters received from Crusel in 1902, and proceeds:

"In other words, the relations between Mr. Crusel and myself were that he came to us to make us propositions for other people. At no time did Mr. Crusel come to us and ask to be made the agent of the Houssiere-Latreille Oil Company. That status was never thought of by me. When the first negotiations with the Texas Company fell through, Mr. Crusel, having, as I thought, the Texas Company as his principal, as stated in the letter, could not get in touch with us for a long time. We were negotiating for ourselves. We thought we could find an operator who would take up the land and enter into a lease, without Crusel. I took up the matter with the Texas Company direct, and went to Beaumont to see the president of the Texas Company, with Senator Caffery. * * * I had met a good many operators at Beaumont, and I thought I could find an operator to take hold of these lands; but the Texas Company was the only company that we looked upon as being strong enough to come to Jennings at that time, as being strong enough to resist the pressure from the Heywoods, who claimed to own the lease on the best part of the property. * * * But, when Mr. Cullinan [the president of the Texas Company] said the Texas Company declined to consider our proposition, and when Mr. Crusel met me in New Orleans and I told him that we had failed to do anything with the Texas Company, he told me that the Texas Company would not deal with us, except through him, and it struck me that there were such relations between him and the Texas Company as would prevent our making a contract except through Mr. Crusel. Mr. Crusel having first introduced us, and the Texas Company having refused to deal with us, the corroboration of Mr. Crusel's statement was so strong that I accepted it unhesitatingly. * * * So that, when Mr. Crusel exposed himself as an impostor, and admitted, as he did, in his letter of September 8, 1904, written from New Orleans, and as was also shown by the representatives of the Texas Company, at our interview, to have been an impostor, I washed my hands of him entirely. Q. It was at the interview of March 29, 1904, that the fact was brought to your knowledge that you could act and deal with the Texas Company without Mr. Crusel? A. Yes. Q. When you discovered that fact, what did you do? A. I suspended all negotiations, brought things to a halt, told the Texas people that we would not discuss the matter any further, and it was my intention not to make any contract at all. * * *

"I base my resistance to this claim on two grounds: First, on the ground that Mr. Crusel represented, falsely, that the Texas Company would not deal with us, except through him. What he said about representing the Texas Company is borne out, and speaking of them as principal is borne out, in letters to us in which he spoke of his principal. I refer to only some of these letters—these letters of October 16, 1902, and November 5, 1902, to Mr. Martel, and of July 11, 1903, to Mr. Martel—in all of which he refers to somebody else he is representing. Mr. Crusel's course of dealing with us was one long systematic deceit, beginning with those letters, pretending to have associates up North, pretending to have people with him who would consider propositions from us, while his only status was that, as it afterwards developed, of agent for the Houssiere-Latreille Oil Company, which status it was not intended to give him, and which was not given him."

The witness nowhere particularly designates the second of the two grounds of resistance to which he thus refers.

Plaintiff, having been called to the stand in rebuttal, positively denied that he "at any time, or at any place, by word of mouth, letter, or suggestion," sought to impress Mr. Caffery with the idea that the Houssiere-Latreille Company could deal with the Texas Company only through him. From the testimony of Martel, Freeman, and Autry it appears to us that the "development" (to which defendant's general manager refers) of the fact that plaintiff was not representing the Texas Company did not take place until after plaintiff's claim for his commission had been refused recognition. The letter of September 8, 1904, in which (the general manager says) plaintiff exposed himself as an impostor, was not offered in evidence and is not in the record, and it appears to have been written more than five months after the Messrs. Caffery had concluded that plaintiff was entitled to no commission.

The letters of October 16 and November 5, 1902, and July 11, 1903, referred to by the general manager, were written to Martel concerning deals that plaintiff was then attempting to negotiate, and we find nothing in the record to justify the belief that they contained any misstatement, or were intended to deceive, or did deceive, Martel or any one else. They read as follows:

Letter of October 16, 1902:

"This is to state to you that, after conference held to-day, we have decided to submit the matter of the proposition to our associates, up North. It might be that some few suggestions or other will be made; but, if so, we shall submit them to you, promptly upon arrival of reply, discuss them freely, and I feel that we should reach a basis to go ahead with the work."

Letter of November 5, 1902:

"This is to state that I, most likely, will be able to give you some very good news within the next few days relative to last proposition pending between us. The matter has been considered favorably, and it only remains to have the closing touches put upon it. I will therefore, most likely, see you very shortly for this."

Letter of July 11, 1903, written from Beaumont:

"I wired you to-day that I am going to New Orleans this evening. This was decided upon suddenly. If it would be convenient for you and Mr. Caffery to meet me at New Orleans next week, I think we can, very likely, frame a contract that will prove very satisfactory to you and friends. If you don't wire me reply to-day, you may telephone me at my house, New Orleans, to-morrow (No. 3,596), or communicate with me at the office there Monday."

Plaintiff gives the following uncontradicted testimony in regard to his relations with the parties defendant, and in regard to what we take to be the subject referred to in the above-quoted letter, to wit:

"As an oil broker and operator and dealer in lands and oil, I was interested in the development of the Beaumont field. When the Jennings field came forward, I took many trips to Jennings; had several meetings with Messrs. Houssiere and Latreille, at their house. I sought to see if I could make some arrangement with them whereby their lands could be developed, and I was informed by both of them that Messrs. Caffery and Martel were the authorized parties to deal with, as they had not sufficient knowledge about these matters; that these attorneys were interested in the land with them; that they knew more about it and were better prepared to preserve their interests. I then met Mr. Martel, and had many conversations with him. He came to New Orleans often. I met him at Franklin. We negotiated for a long time. I first made a contract, I think it was the latter part of 1902, for a lease of a portion of the property on the Latreille tract. That contract was made with the Texas Company. The representations as to the title to the land and all those things were stated to me, and

I brought them to the Texas Company, expecting to receive a contract from those parties according to my proposition. A contract reached them [the Texas Company, as we understand the witness] quite different from the proposition, and it was not signed. There was nothing done about it. Later on negotiations were resumed. I had many more interviews with Mr. Martel, and I met the Messrs. Caffery, also. Whenever we would meet, we would discuss the matter together. About the latter part of 1903 I was informed by Mr. Martel that the proper party to deal with was Mr. D. Caffery, Jr.; that he had full authority; and that he (Martel) was not carrying on negotiations about leases."

For the rest, and as showing plaintiff's relation to the Texas Company in the matter of the contract of March 29, 1904, we quote as follows from the testimony of Freeman, to wit:

"I was active and instrumental in bringing about this lease, as the representative of the Texas Company, and my negotiations in this regard were conducted through Mr. J. Edw. Crusel. * * * So far as my knowledge of the transaction extends, all of the preliminary correspondence which led to the conferences hereinbefore described, and which ultimately led to the making of the lease, * * * were brought about by, and carried through on, the activities of Mr. J. Edw. Crusel, and he was present and participated in both the conferences which were conducted between the representatives of the two companies, and it was at his insistence and appointment that the dates of meeting, etc., were agreed upon between the two companies. * * * I think, in connection with my withdrawing from the room, in connection with the controversy which had arisen between Mr. Crusel and the Houssiere-Latreille Oil Company, that I did make it perfectly clear to all parties concerned that Mr. Crusel was in no way connected with the Texas Company in the matter, and that, whatever questions in the way of compensation or commission were in the matter for him, it was entirely between him and the Houssiere-Latreille Company people, and was a matter in which the Texas Company and its representatives had nothing to do; and it was at this point of discussion that Judge Autry and I withdrew from the discussion, leaving the contract, as hereinbefore stated, for the consideration and signature of the Houssiere-Latreille Oil Company people. * * * Mr. Crusel did not represent the Texas Company in any way in the matter of the contract between the Texas Company and the Houssiere-Latreille Company. * * * In so far as I knew, or now know, Mr. Crusel's status in relation to said contract was that of a broker, or agent, for the Houssiere-Latreille Oil Company, and it was in that capacity that I dealt with him. * * * I know of no reason why the Texas Company would not have entered into a contract with the Houssiere-

Latreille Oil Company independent of Mr. Crusel, if the matter had come to us in that way; but I also know that, so far as my contract [connection] with that transaction is concerned, all of the preliminary negotiations and the fixing of dates and conferences that finally resulted in the making of a contract resulted from Mr. Crusel's activities and touch in the matter, and he was thoroughly familiar with all the details preliminary to the final meeting, and continued active up to the day of the closing of the contract. This being true, we could not, at that time, have closed the transaction, independent of those facts."

### Opinion.

The grounds upon which defendant's general manager, in his testimony, predicates his "resistance" to the payment of any compensation to the plaintiff are wholly ignored by defendant's counsel, and in their stead we have presented to us certain propositions, which, as we understand them, may be stated as follows:

(1) That plaintiff, having set up a contract which would entitle him to recover 5 per cent. of all the oil produced and to be produced under the lease to the Texas Company, is bound by his allegations as to the meaning of such contract, and, failing to prove them, cannot be permitted to establish a contract by virtue whereof he would be entitled to recover, as commission, 5 per cent. of the oil received and to be received by defendant as royalty under said lease; the fact being that plaintiff interpreted the supposed contract in one way, whilst the other contracting party (defendant's general manager) interpreted it in another way, from which it follows that there was no aggregatio mentium, and no contract, and hence can be no recovery.

(2) That defendant's general manager was without authority to bind it for the purposes of a contract such as that here sued on; that the ratification relied on was not predicated upon full knowledge, brought home to defendant's board of directors, as such, of the action said to have been ratified; that such knowledge, even if brought home to the members of such board individually, does not bind the board, or corporation, with respect to any subsequent supposed ratification by either.

1. It is true that plaintiff sets up a contract which he alleges entitles him to 5 per cent. of all the oil produced and to be produced under the lease to the Texas Company. It is also true that defendant's general manager, as a witness on its behalf, testifies that the contract between him, as defendant's representative, and plaintiff, contemplated that plaintiff should receive, as a commission, 5 per cent. of the oil coming to defendant as royalty under any lease made by it to a lessee found by plaintiff. It is further true that defendant made a lease to the Texas Company under which it has received a large quantity of oil, and that the lessee was found and the lease effected through the efforts of the plaintiff. It is likewise true that plaintiff now acquiesces in the interpretation placed on the contract by defendant's representative, and prays for judgment in accordance therewith.

If, however, it results that the judgment appealed from, absolutely rejecting plaintiff's demand, must be affirmed, as contended by defendant, then, although plaintiff has unquestionably rendered valuable service to defendant, with an agreement, made in advance, that he should be compensated therefor, he can recover nothing; for, if he sues again upon the contract as interpreted by defendant's general manager, he will be met, as now, with the objection that he himself did not so understand the contract, and if he sues on quantum valebat he will be met with the objection that he can recover no more than the general manager, acting for defendant, agreed to give him. We cannot adopt a view leading to such result. If suit is brought for compensation for service rendered under contract, and defendant denies that there was any contract, and, the evidence being confined to the issues thus presented, the court finds

that there was no contract, the suit must be dismissed, for lack of evidence on which to predicate a judgment, though plaintiff may then bring another suit on quantum valebat.

If, however, plaintiff sues on quantum valebat, and defendant proves that the services were rendered under a contract fixing the compensation, the amount or rate of which is also proved, we know of no reason why there should not be judgment on the basis thus established, since in such case the facts are all before the court, and the law, abhorring a multiplicity of litigation, does not readily deny to a litigant the reward of his labor or permit one person to enrich himself at the expense of another. Where the parties come into court, each insisting that there is a contract between them, but differing as to its interpretation, the court, by the application of certain familiar rules, may find that there was a contract, as alleged by one of the parties, and notwithstanding the denial of the other.

Thus, in the absence of fraud, or of error superinduced by one to the prejudice of the other, if the contract by its terms is reasonably susceptible of but one interpretation, it will be presumed that the parties intended that it should be so interpreted; or if the terms of the contract are ambiguous, and the ambiguity can be explained by so doing, the court will impute to the parties knowledge of such extraneous facts, bearing upon the subject, as they may be presumed to have possessed, and the possession of which would, in effect, estop either to deny the correctness of a particular interpretation, as, for instance, where one, alleging that he was employed for a specified term and discharged without cause before its expiration, sues for a balance of wages, and the suit is defended on the ground that the employment was at will, it may sometimes be shown that there was a usage of the place, or business, or both, in the matter of such employment, or, where the employer is a corporation, that such contracts are regulated by its charter or by-laws, and it may be found that the parties were bound to have known of such usage, or of such regulation, and should be presumed to have contracted with reference to them. Miller v. Gidiere & Marmonde, 36 La. Ann. 203; Woods v. Shumard & Co., 114 La. 451, 38 South. 416; Berlin v. Cusachs, 114 La. 744, 38 South. 539; Dinkgrave v. Vicksburg Co., 10 La. Ann. 514; Hunter v. Sun Ins. Co., 26 La. Ann. 13.

Upon the other hand, the court might be unable, upon any sound principle, to find that either party should be held to have concurred in the contract propounded by the other, in which case it would, of course, follow that there could have been no contract between them; but it would not necessarily follow that the suit should be dismissed, since, the rendition of the service being proved, and it appearing, from defendant's admission, or from the proof administered by him, that he had promised to pay a certain sum therefor, if plaintiff should then acquiesce in such interpretation of his supposed contract, no sufficient reason has been suggested, and none occurs to us, why, under his prayer for general relief, he should not have judgment for the sum so admitted or proved to have been promised. Thus it has been held that, under a prayer for general relief, where the evidence, admitted without objection, justifies it (and, a fortiori, where, as in this case, such evidence is introduced by defendant), plaintiff, suing in a representative capacity, may recover individually; where a lessor sues for the rescission of the lease and a penalty for delay in paying the rent, though his prayer be not allowed, he may be entitled to judgment for rent, with interest; where a privilege, not claimed, necessarily results from defendant's admission in his answer, it will be allowed; where plaintiff claims property as owner, a privilege may be allowed him, if proved without objection, defendant not being

surprised. Cross on Pleading, p. 97, and authorities there cited.

It has also been held, in cases in which no admission by defendant was involved, that under the prayer for general relief, where defendant was sued as executor on notes signed by him as such, and it was found that he had exceeded his powers as executor, he might be condemned individually; where a creditor sued to annul a wife's judgment, the court, with the necessary evidence before it, would amend the judgment of separation and adjust the respective rights of the parties, without driving them to further litigation; where, in an action on account, defendant was credited with notes erroneously supposed to belong to him, judgment would go for the whole amount, not deducting the notes, though the reduced amount alone was claimed. Id., p. 98.

Whether the contract here sued on, as interpreted by plaintiff, was reasonable or unreasonable, depends on circumstances which are not fully disclosed. Defendant owned what it hoped might prove to be oil-bearing land, and was without means to develop it, and up to November 24, 1904, when its general manager proposed to plaintiff that he should find some one (preferably the Texas Company) who would be willing to take that risk, had itself failed to find such a person. It is conceded (in the testimony) that in order to do so it was necessary to offer from 25 per cent. to 50 per cent. of the oil that might be developed, and, so far as we can see, it could have made no difference to defendant whether such percentage should be given to the lessee, who would undertake the development, or to such lessee and the broker who would produce him together, and the amount to be given to either or both depended upon the urgency of the need, which may have been greater or less as the danger that the lands would be drained by wells on adjoining lands was greater or less, or the necessities of the parties interested were greater or less.

The first of the propositions between the Texas Company and the defendant, which the latter considered, was one to the effect that the Texas Company should be allowed 60 per cent. of the oil to be produced by "gushers," and say 84 per cent. of that to be produced by pumping, after being reimbursed the original cost of the wells. The proposition agreed on was that the Texas Company, after being reimbursed the original cost of the wells, should be allowed 70 per cent. of the oil to be produced "all around"; that is to say, from gushers and pumping alike. Whether, before the Texas Company was found, defendant would have been willing to give an additional percentage for its discovery, was a matter for its officers to determine. As to what, through its officers, it did in that regard, the testimony of plaintiff is as follows, to wit: At one time he says:

"Mr. Caffery, Jr., told me that if I would agree to bring parties to lease he would guarantee me that his company would pay me 5 per cent. commission for doing so."

At another time he says that he told the president of the Texas Company that Caffery had guaranteed him "that his company would pay me [him] 5 per cent. royalty." At another time he says that Caffery said:

"That he and his father had discussed the commission matter * * * and that, in case the land should turn out to be oil-producing, it would make a large amount of money for me, and that they wanted me to reduce the 5 per cent. commission."

And at still another time he says:

"Mr. Caffery, Jr., had a thorough understanding with me about that commission. It was confirmed in this letter [referring to his letter of February 20, 1904]. Before that, when I dealt with Mr. Martel, I had an understanding with him of 10 per cent. of the output for commission, and Mr. Caffery was also aware

of that, and told me he wanted me to reduce my commission to 5 per cent., and I agreed to it."

In the letter referred to (written by him to Caffery, after the interview at which the commission had been discussed, and which he was allowed to act upon, but to which Caffery made no reply) he said:

"My commission for bringing about the above deal to be 5 per cent., and, in case you should have to make concessions, whereby, for yourself and your co-owners, you should have to take less than 25 per cent. royalty, then I am to take the corresponding decrease in the amount of my commission, which is to come out of your 25 per cent."

It will be remembered, in this connection, that under the deal as made Caffery and his associates were not obliged to take less than 25 per cent. royalty, but received a royalty of 30 per cent. "all around."

Mr. J. Sully Martel, testifying as to what took place at the conference of March 29, 1904, says that the party went to dinner, leaving the stenographer redrafting the proposed contract with the Texas Company, and (to quote his language):

"When we came back, the discussion was resumed. We found Mr. Latreille here, and Mr. Crusel broached the subject of commission, and it was then that Senator Caffery became very indignant, and said he did not want to pay any such commission. * * * Mr. Don Caffery, Jr., retired to that room over there, and * * * Mr. Freeman said that he regretted the misunderstanding, * * * and about that time D. Caffery, Jr., and Mr. Crusel came back, and Crusel said to Senator Caffery that, in order to have this thing go through, I am willing to take one-half the commission. * * * Senator Caffery told his son * * * that Mr. Freeman had just told him that Mr. Crusel did not represent the Texas Company, and that they did not have to deal through Crusel with the Texas Company. Then Mr. Caffery, Sr., declined the proposition of Mr. Crusel to accept 2½ per cent."

At another place he says:

"Mr. Crusel asked him [Senator Caffery] about the commission, and then Senator Caffery asked him, 'What's that?' and he said, 'Five per cent.' Q. And then it was that Senator Caffery became indignant, saying that was too much? A. Yes, sir; he became indignant, and refused to give him any commission at all."

D. Caffery, Jr., as we have already seen, says:

"The idea that the 5 per cent. was to be upon the total production of the land never occurred to me until after the suit was instituted. It was presented to me when Mr. Crusel sent me his contract to be signed [at some time subsequent to March 29, 1904]. But it did not come clearly home to me until after the institution of this suit. In other words, it would be giving Mr. Crusel one-sixth of the Houssiere-Latreille Oil Company's royalty, and I am sure that Mr. Crusel would not have dared to advance any such proposition as that as a business man."

At another time he says that, whilst the letter of February 20th was ambiguous on the subject of plaintiff's commission, "there was no ambiguity in the agreement."

Upon the case as thus presented, in the absence of any acquiescence by plaintiff in the construction thus placed by defendant's representative on the supposed contract, and in the absence of any better defense than nul tiel contract, it seems to us that the court would be bound to give judgment for plaintiff, either as prayed for by him, or upon the basis of the contract as set up in the testimony of defendant's principal witness. As the matter stands (and unless there be a better defense), there is no alternative to the awarding of the smaller amount accruing to plaintiff by reason of his acquiescence in such construction.

2. There is no specific denial in the pleadings, or in the testimony adduced on behalf of defendant, of the authority of its general manager to make either the contract alleged in the petition or that set up by him in his testimony; and no suggestion that plaintiff's claim could be defeated or that defendant desired to defeat it, on that ground, appears to have been made at the conference of March 29th, when the merits of the claim were discussed by a majority, not only of defendant's board of directors, but of its stockholders. To the contrary, in addition to the testimony of the general manager himself

(quoted in the statement of the case), he was interrogated and answered as follows:

"Q. You conducted a great deal of correspondence? You and Mr. Martel conducted the correspondence? A. Yes, sir. Q. You were acting for your associates, for the company, and in the interest of all concerned? A. We were all— All our associates wanted development. Q. And you were seeking it? A. Yes, sir. Q. They took no active interest? Messrs. Houssiere and Latreille did not exert themselves? A. Mr. Martel and I were the active members of the association. Q. And then subsequently you were general manager of the company, and acted in that capacity? A. Yes, sir."

Under the circumstances as thus disclosed, and in view of the manner in which the affairs of the defendant company were conducted, with the knowledge and acquiescence of all concerned, we should consider it inequitable to hold that the obligation here sought to be enforced, incurred, as probably, most of the obligations of the company were incurred, without formal previous action by the board of directors, does not bind the defendant, even if the action of its general manager in the premises had not been subsequently ratified by the corporation. But there can be no doubt that defendant's board of directors, in formal meeting, authorized the contract with the Texas Company, and in so doing accepted and appropriated to the use of the company the results of the plaintiff's labor, knowing full well the conditions upon which it had been performed.

This court has recently had occasion to quote, with approval, the following passage, applicable to the situation here presented, from a prominent writer on corporation law, to wit:

"The authority of the subordinate agents of a corporation often depends upon the course of dealings which the company, or its directors, have sanctioned. It may be established, without reference to the official record of the proceedings of the board, by proof of the usages which the company has permitted to grow up in its business and of the acquiescence of the board, charged with the duty of supervising and controlling the company's business." Berlin v. Cusachs, 114 La. 747, 38 South. 540.

And the Supreme Court of the United States, referring to the matter of irregular corporate action, has said:

"Courts do not look at such transactions with the microscopic eyes of a special demurrer. * * * The transaction, like all others, was made to the knowledge of the trustees individually, and they never objected. This intelligent acquiescence was a binding ratification." Creswell v. Lanahan, 101 U. S. 352, 25 L. Ed. 853.

Again:

"When a contract is made by any agent of a corporation, in its behalf and for a purpose authorized by its charter, and the corporation receives the benefit of the contract without objection, it may be presumed to have authorized or ratified the act of its agent." Railway Co. v. Keokuk & Hamilton Bridge Co., 131 U. S. 371, 9 Sup. Ct. 773 (33 L. Ed. 157).

And again our predecessors in this court have said:

"There is no principle better settled than that he for whom a contract has been made, subject to his ratification, is presumed to ratify it, unless he, immediately on being informed thereof, repudiate it." Lartigue v. Peet & Another, 5 Rob. 92.

In the instant case the defendant accepted the results of plaintiff's service, knowing that he had rendered them upon the faith of an obligation, incurred in its name and behalf, for his compensation, and the only repudiation of that obligation or of the authority by which it was incurred that has been attempted is that which is to be found in the argument of defendant's learned counsel, predicated on the "general denial" filed as a defense to this suit. We are of opinion that the obligation was authorized in the beginning, that it was ratified by the corporation in the receipt and enjoyment by it of the consideration therefor, and that the attempted repudiation for want of authority in the agent is ineffectual.

The amount of oil received by defendant under its lease to the Texas Company, less the amount required to pay its share of the cost of sinking the wells, appears to have been 586,916.89 barrels, and the value of the oil,

at the date of the trial in the district court, is shown to have been 70 cents per barrel. Plaintiff is therefore entitled to judgment for 29,345.84 barrels of oil (being 5 per cent. of 586,916.89 barrels) or its value, at 70 cents per barrel, say $20,542.08.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be annulled, avoided, and reversed, and that there now be judgment for plaintiff, condemning defendant to deliver to him, as his commission upon oil received by defendant, up to February 1, 1908, 29,345.84 barrels of such oil, and, in default of such delivery within 30 days from the date at which this judgment shall become final, condemning defendant to pay plaintiff the sum of $20,542.08, with legal interest from said date. It is further decreed that plaintiff's right to recover his commission on oil received by defendant since February 1, 1908, and that may hereafter be received by defendant, under its contract with the Texas Company of March 29, 1904, be reserved. It is further decreed that defendant pay all costs.